1   COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
2   DARREN J. ROBBINS (168593)
    DAVID C. WALTON (167268)
3   655 West Broadway, Suite 1900
    San Diego, CA 92101
4   Telephone: 619/231-1058
    619/231-7423 (fax)
5   darrenr@csgrr.com
    davew@csgrr.com
6
    ABRAHAM FRUCHTER & TWERSKY LLP
7   JACK G. FRUCHTER
    One Pennsylvania Plaza, Suite 2805
8   New York, NY 10119
    Telephone: 212/279-5050
9   212/279-3655 (fax)
    jfruchter@aftlaw.com
10
    Attorneys for Plaintiff
11
                    UNITED STATES DISTRICT COURT
12
                    CENTRAL DISTRICT OF CALIFORNIA
13
                          SOUTHERN DIVISION
14
    MENACHEM MAIMAN, Individually   )   **VIA FAX**
15  and On Behalf of All Others Similarly )
    Situated,                        )   No.  **SACV09-00012 AG (ANx)**
16                                    )
                      Plaintiff,     )   CLASS ACTION
17                                    )
         vs.                         )   COMPLAINT FOR VIOLATION OF
18                                    )   THE FEDERAL SECURITIES LAWS
    GREGORY C. TALBOTT and KEVIN      )
19  MCCARTHY,                         )
                                      )
20                    Defendants.     )   DEMAND FOR JURY TRIAL
                                      )
21
22
23
24
25
26
27
28

**JURISDICTION AND VENUE**

1.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 ("1934 Act").  The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.  The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

2.    Venue is proper here pursuant to §27 of the 1934 Act.  Many of the false and misleading statements were made in or issued from this District.  PFF Bancorp, Inc. has a substantial presence in California and certain of the defendants reside in this District.  Many of the acts and transactions giving rise to the violations of law complained of occurred here.

3.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**INTRODUCTION**

4.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of PFF Bancorp, Inc. ("PFF" or the "Company") between October 23, 2006 and November 21, 2008 (the "Class Period"), against certain of PFF's officers and/or directors for violations of the 1934 Act.

5.    PFF operates as a holding company for PFF Bank & Trust (the "Bank"), which provides community banking services to individuals and companies in Southern California.  In addition, PFF originates a portfolio of loans, including multifamily loans, commercial real estate loans, construction and land loans to developers, residential lot loans, consumer loans, and loans to individuals for the construction and permanent financing of single family homes.

6.    During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results.  Defendants engaged in improper behavior which harmed PFF's customers and

- 1 -

1  investors in its common stock. These practices included lending to borrowers with
2  little ability to repay the amount loaned and failing to inform investors of the impact
3  of changes in the real estate market in San Bernardino and Riverside counties (the
4  "Inland Empire"). The apparent peaking of real estate prices in these counties during
5  2006 was a major threat to PFF's business. This would lead to severe problems in the
6  long-term for the Company itself, yet defendants concealed the impact of these
7  changes on the Company so as to unjustly enrich themselves while in possession of
8  material, adverse, non-public information concerning PFF's operations and unsound
9  mortgage practices.

10      7.    As a result of defendants' false statements, PFF's stock traded at
11  artificially inflated prices during the Class Period, reaching a high of $35.45 per share
12  in December 2006.

13      8.    During the summer and fall of 2007, PFF stock declined as the Company
14  announced additional loan losses and accounting issues. However, the stock
15  continued to be artificially inflated as defendants concealed the full extent of PFF's
16  exposure to mortgage-related asset impairment.

17      9.    On April 1, 2008, PFF issued a press release entitled "PFF Bancorp, Inc.
18  Announces Sale of DBS Loans and Preliminary Credit-Related Information for the
19  Fourth Fiscal Quarter," in a release which stated in part:

20          PFF Bancorp, Inc. announced today that its subsidiary, Diversified
21          Builder Services, Inc. ("DBS") has completed the sale of substantially all
22          of its loan portfolio. The risk profile of this portfolio was significantly
23          greater than that of the Bank's loan portfolio, with second trust deeds
24          and unsecured loans comprising a significant portion of the portfolio.
25          DBS recorded a provision for loan losses of approximately $48 million
26          in the March quarter, reflecting the write-downs associated with the
27          expedited disposition of the portfolio.

28                          *     *     *

1        The Company's bank subsidiary, PFF Bank & Trust (the "Bank"),
2    is continuing its process of completing a comprehensive quarterly review
3    of its loan portfolio, including the updating of appraisals on properties
4    securing loans that have been previously identified as classified or
5    criticized. This review will not be completed for several more weeks.
6    However, based upon preliminary results of this review, the Company
7    believes that the Bank's provision for loan and lease losses for the
8    quarter ended March 31, 2008, may exceed *$120 million*. The provision
9    is attributable principally to the residential construction and land
10   segments of the Bank's portfolio, and reflects changes in the valuation
11   allowances assigned to previously criticized or classified assets as a
12   result of reductions in collateral values based upon updated appraisals,
13   and to a lesser extent, the identification of additional problem credits and
14   the migration of previously identified criticized or classified assets
15   within classification categories.

16       10.    After this disclosure, PFF's stock fell $1.62 per share to close at $6.86
17   per share.

18       11.    On April 30, 2008, PFF issued a press release entitled "PFF Bancorp, Inc.
19   Provides Preliminary Financial Information for Quarter Ended March 31, 2008," [1]
20   which stated in part:

21       PFF Bancorp, Inc. (the "Holding Company"), the holding company for
22   PFF Bank & Trust (the "Bank"), Diversified Builder Services, Inc. and
23   Glencrest Investment Advisors, Inc., today announced that it expects to
24   report a consolidated net loss of approximately $159 million for the
25   quarter ended March 31, 2008. The operating results for the quarter

27   [1]    PFF's fiscal year ends March 31.

1   include an estimated *$196 million* consolidated provision for loan and
2   lease losses and an estimated $44 million valuation allowance
3   established against the Holding Company's consolidated deferred tax
4   asset.

5   12.   On this news, PFF's stock dropped to $2.48 per share on May 1, 2008, a
6   decline from $3.78 per share on April 30, 2008, and a decline of 85% from $18.50 per
7   share on August 9, 2007. The following day, May 2, 2008, the stock dropped even
8   further to $1.83 per share as the news was more fully absorbed by the market.

9   13.   On July 15, 2008, PFF announced it would move its shares from trading
10   on the New York Stock Exchange to the OTC Bulletin Board.

11   14.   Finally, the debacle was complete when, on November 21, 2008, after the
12   market closed, the Bank was closed by regulators and taken over by U.S. Bancorp.
13   Following this announcement, PFF's stock declined to $0.01 per share – a total loss
14   for investors.

15   15.   The true facts, which were known by the defendants but concealed from
16   the investing public during the Class Period, were as follows:

17   (a)   Defendants' assets contained hundreds of millions of dollars worth
18   of impaired and risky securities, many of which were backed by real estate that was
19   rapidly dropping in value;

20   (b)   Prior to and during the Class Period, PFF had been extremely
21   aggressive in generating loans, including being heavily involved in offering Home
22   Equity Lines of Credit ("HELOCs"), which would be enormously problematic if the
23   value of residential real estate did not continue to increase;

24   (c)   Defendants failed to properly account for PFF's real estate loans,
25   failing to reflect impairment in the loans;

26   (d)   PFF's business prospects were much worse than represented due to
27   problems in the Inland Empire market, which was a key focus of PFF's business; and

28

1        (e)    PFF had not adequately reserved for loan losses on HELOCs and

2    on other real estate-related assets.

3        16.    As a result of defendants' false statements, PFF's stock traded at inflated

4    levels during the Class Period.  However, after the above revelations seeped into the

5    market, the Company's shares were hammered by massive sales, sending them down

6    more than 100% from their price before these disclosures.

7    **THE PARTIES**

8        17.    Plaintiff Menachem Maiman purchased PFF common stock as described

9    in the attached certification and was damaged thereby.

10       18.    Defendant Kevin McCarthy ("McCarthy") is, and at all relevant times

11   was, a director, President and Chief Executive Officer ("CEO") of PFF and the Bank.

12   McCarthy participated in the issuance of improper statements, including the

13   preparation of the improper press releases and SEC filings.

14       19.    Defendant Gregory C. Talbott ("Talbott") is, and at all relevant times

15   was, Executive Vice President, Chief Financial Officer ("CFO") and Chief Operating

16   Officer ("COO") of PFF and the Bank.  Talbott participated in the issuance of

17   improper statements, including the preparation of the improper press releases and SEC

18   filings.

19       20.    Defendants McCarthy and Talbott, because of their positions with the

20   Company, possessed the power and authority to control the contents of PFF's

21   quarterly reports, press releases and presentations to securities analysts, money and

22   portfolio managers and institutional investors, *i.e.*, the market.  They were provided

23   with copies of the Company's reports and press releases alleged herein to be

24   misleading prior to or shortly after their issuance and had the ability and opportunity

25   to prevent their issuance or cause them to be corrected.  Because of their positions

26   with the Company, and their access to material non-public information available to

27   them but not to the public, the defendants knew that the adverse facts specified herein

28   had not been disclosed to and were being concealed from the public and that the

1  positive representations being made were then materially false and misleading. The
2  defendants are liable for the false statements pleaded herein.

3  **FRAUDULENT SCHEME AND COURSE OF BUSINESS**

4        21.    Defendants are liable for: (i) making false statements; or (ii) failing to
5  disclose adverse facts known to them about PFF. Defendants' fraudulent scheme and
6  course of business that operated as a fraud or deceit on purchasers of PFF common
7  stock was a success, as it: (i) deceived the investing public regarding PFF's prospects
8  and business; (ii) artificially inflated the price of PFF common stock; and (iii) caused
9  plaintiff and other members of the Class to purchase PFF common stock at inflated
10 prices.

11 **BACKGROUND**

12       22.    PFF is a diversified financial services company and operates as a holding
13 company for the Bank.   PFF conducts its business principally through its wholly
14 owned subsidiary, the Bank.   The Company's business also includes Glencrest
15 Investment Advisors, Inc. ("Glencrest"), a registered investment advisor that provides
16 wealth management and advisory services to high net worth individuals and
17 businesses, and Diversified Builder Services, Inc. ("DBS"), a provider of financing
18 and consulting services to home builders and land developers.  Additionally, PFF
19 owns 100% of the common stock of two unconsolidated special purpose business
20 trusts. PFF, through the Bank, provides community banking services to individuals
21 and companies in southern California. PFF attracts funds from the general public and
22 institutions; originates and invests in loans, such as residential real estate mortgage
23 loans, investment securities, and mortgage-backed securities; and originates and sells
24 loans to investors in the secondary markets. PFF originates a portfolio of other loans,
25 including multifamily loans, commercial real estate loans, construction and land loans
26 to developers, residential lot loans, consumer loans, and loans to individuals for the
27 construction and permanent financing of single family homes. The single largest asset
28 on PFF's balance sheet was Loans and Leases Receivable, representing 88% of assets

1    as of March 31, 2006.  Thus, the valuation of this asset was crucial to PFF's financial
2    statements.  If real estate values declined, the ability of borrowers to repay the loans
3    might be adversely affected, as would possible recoveries to PFF should borrowers
4    default on their obligations.

5         23.    By October 2006, residential real estate was showing increasing signs of
6    peaking, particularly in California.  This threatened PFF's growth prospects and the
7    valuation of its real estate-related assets, and its stock price, which had traded in the
8    $25-$35 per share range for years.  Defendants concealed the impact of the changing
9    real estate market on the Company's financial statements in order to keep the stock
10   price in that same range.

11              **DEFENDANTS' FALSE AND MISLEADING**
                **STATEMENTS ISSUED DURING THE CLASS PERIOD**

12        24.    On October 23, 2006, PFF reported its second quarter fiscal 2007
13   financial results in a release that stated in part:

        PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
        "Bank"), Diversified Builder Services, Inc. ("DBS") and Glencrest
        Investment Advisors, Inc. ("Glencrest"), today reported net earnings of
        $14.0 million or $0.56 per diluted share for the quarter ended September
        30, 2006 compared to $13.4 million or $0.54 per diluted share for the
        comparable period of 2005.

                        *        *        *

        Kevin McCarthy, President and CEO commented, "Our loan and
        deposit portfolios continue to benefit from the strong population and job
        growth taking place in the Inland Empire.  ***Our confidence in the region
        is reflected by our previously announced plans to expand our full
        service branch network by eight new locations to 38 branches within
        the next year***."

                        *        *        *

                              - 7 -

1    Non-accrual loans were $617,000 or 0.01 percent of gross loans
2    and leases at September 30, 2006. Classified assets rose $13.4 million
3    during the current quarter to $32.8 million at September 30, 2006 due to
4    a $15.0 million commercial loan secured by equipment leases. This loan
5    is paying as agreed although some of the underlying leases are non-
6    performing. This loan accounted for $850,000 of the $2.5 million
7    provision for loan and lease losses during the current quarter. At
8    September 30, 2006, our allowance for loan and lease losses ("ALLL")
9    was $40.3 million or 0.85 percent of gross loans and leases compared to
10    $37.1 million or 0.83 percent of gross loans and leases at March 31,
11    2006.

12                    *         *         *

13    Given our strong loan growth, we did not repurchase any shares of
14    our common stock during the current quarter. At September 30, 2006,
15    954,310 shares remain under a 1.0 million share repurchase authorization
16    adopted by our Board of Directors on October 26, 2005.

17    At September 30, 2006, we were conducting business through 30
18    full-service banking branches, three registered investment advisory
19    offices, three trust offices, a Southern California regional loan center, an
20    office providing diversified financial services to home builders and one
21    loan origination office in Northern California. Assets under management
22    or advisory by Glencrest and the Bank's trust department increased to
23    $708.5 million at September 30, 2006, compared to $577.6 million at
24    September 30, 2005. These assets under management or advisory include
25    $572.6 million managed or advised by Glencrest at September 30, 2006,
26    as compared to $428.2 million at September 30, 2005.

27    25.    After these results, on November 2, 2006, PFF was raised to
28    "outperform" from "market perform" by Friedman, Billings, Ramsey & Co., with a

1　price target of $38.00 per share.  PFF's stock price increased on this news to $31.64
2　per share.

3　　　　26.　　On January 22, 2007, PFF announced its third quarter fiscal 2007
4　financial results in a release which stated in part:

5　　　PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
6　　　"Bank"), Diversified Builder Services, Inc. ("DBS") and Glencrest
7　　　Investment Advisors, Inc. ("Glencrest"), today reported net earnings of
8　　　$13.6 million or $0.55 per diluted share for the quarter ended December
9　　　31, 2006 compared to $13.2 million or $0.53 per diluted share for the
10　　　comparable period of 2005.

11　　　　　　　　　　　*　　　*　　　*

12　　　　The average balance of construction, commercial business,
13　　　commercial real estate and consumer loans (the "Four-Cs") increased
14　　　$96.3 million or 4 percent during the three months ended December 31,
15　　　2006. Based on end of period balances, the Four-Cs increased $37.0
16　　　million on a sequential quarter basis. At December 31, 2006, the Four-Cs
17　　　total $2.46 billion or 60 percent of loans and leases receivable, net,
18　　　compared to $1.88 billion or 53 percent of loans and leases receivable,
19　　　net, one year ago. Four-Cs originations were $419.9 million or 85
20　　　percent of total originations for the current quarter compared to $472.4
21　　　million or 81 percent of total originations for the comparable quarter of
22　　　2005 and $612.8 million or 86 percent of total originations for the
23　　　quarter ended September 30, 2006. At December 31, 2006, DBS had
24　　　outstanding loans receivable, net, of $104.0 million compared to $76.1
25　　　million one year ago and $89.9 million at September 30, 2006. The
26　　　majority of DBS's loans are classified as construction and land.

27　　　　　　　　　　　*　　　*　　　*

28

- 9 -

1    Non-accrual loans were $1.5 million or 0.03 percent of gross loans
2    and leases at December 31, 2006. At December 31, 2006, our allowance
3    for loan and lease losses ("ALLL") was $42.1 million or 0.89 percent of
4    gross loans and leases compared to $37.1 million or 0.83 percent of gross
5    loans and leases at March 31, 2006. Our $1.9 million provision for loan
6    and lease losses for the current quarter reflects the cautious approach we
7    are taking to credit evaluation in light of the slower levels of absorption
8    in some segments of the residential housing market. While all of our
9    construction loans remain on full accrual status and there are no specific
10   allowances assigned to any loans in that portfolio, current market
11   conditions warrant an increase in the level of general valuation
12   allowance assigned to our construction loan portfolio.

13   27.    On February 28, 2007, PFF increased its dividend to $0.19 per share.

14   28.    On April 23, 2007, PFF reported its fiscal 2007 results, which included
15   its fourth quarter 2007 financial results, in a release which stated in part:

16   PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
17   "Bank"), Diversified Builder Services, Inc. ("DBS") and Glencrest
18   Investment Advisors, Inc. ("Glencrest"), today reported net earnings of
19   $55.9 million or $2.25 per diluted share for the year ended March 31,
20   2007 ("fiscal 2007"), up 7 percent from $52.1 million or $2.10 per
21   diluted share for the previous fiscal year ("fiscal 2006").

22   Net interest income increased $11.6 million or 7 percent between
23   fiscal 2006 and 2007 to $182.1 million. Net interest margin contracted
24   27 basis points to 4.15% between fiscal 2006 and 2007. On a sequential
25   quarter basis, net interest margin contracted 5 basis points to 4.00%.
26   Average interest- earning assets increased $527.7 million or 14 percent
27   between fiscal 2007 and 2006. On a sequential quarter basis, average
28   interest-earnings assets decreased slightly by $38.4 million.

1    Construction, commercial business, commercial real estate and
2    consumer loans (the "Four-Cs") increased $338.6 million or 16 percent
3    during fiscal 2007 to $2.51 billion or 61 percent of loans and leases
4    receivable, net, compared to $2.17 billion or 56 percent of loans and
5    leases receivable, net, one year ago. Four-Cs originations were $2.01
6    billion or 86 percent of total originations for fiscal 2007 compared to
7    $2.38 billion or 85 percent of total originations for fiscal 2006. On a
8    sequential quarter basis, the Four-Cs increased $49.0 million. At March
9    31, 2007, DBS had outstanding loans receivable, net, of $118.4 million
10   compared to $87.0 million one year ago and $104.0 million at December
11   31, 2006. The majority of DBS's loans are classified as construction and
12   land.

13                              *      *      *

14       Kevin McCarthy, President and CEO commented, "*Sound
15   execution of our business model is continuing to deliver strong and
16   consistent balance sheet growth in a very competitive banking
17   environment*. With the addition of our second Riverside branch in March
18   2007, our Apple Valley branch earlier this month and our previously
19   announced additional branch expansion, we are positioning ourselves for
20   continued profitable growth in the Inland Empire."

21                              *      *      *

22       At March 31, 2007, our allowance for loan and lease losses
23   ("ALLL") was $46.3 million or 0.98 percent of gross loans and leases
24   compared to $37.1 million or 0.83 percent of gross loans and leases at
25   March 31, 2006. Classified assets increased from $21.5 million at March
26   31, 2006 to $65.8 million at March 31, 2007, primarily due to two
27   construction loans; a $31.7 million tract construction loan located in
28   Palm Desert, California and the $8.9 million nonaccrual construction

                              - 11 -

1    loan mentioned above, both of which were classified substandard. The
2    tract construction loan in Palm Desert is not past due, however, slower
3    than anticipated sales and lower property valuations warranted the
4    classification.

5        Loan charge-offs, net of recoveries for fiscal 2007 totaled
6    $531,000, or 0.01 percent of average loans and leases receivable, net,
7    compared to $2.6 million or 0.07 percent of average loans and leases
8    receivable, net for fiscal 2006.

9        We recorded a $9.7 million provision for loan and lease losses for
10   fiscal 2007 compared to $6.4 million for the comparable period of 2006.
11   The increase in our provision for loan and lease losses for fiscal 2007 is
12   attributable primarily to the construction loans located in Palm Desert
13   and Scottsdale mentioned above, in addition to the cautious approach we
14   are taking to credit evaluation in light of the slower levels of absorption
15   in some segments of the residential housing market.

16                          *       *       *

17       We repurchased 476,500 shares of our common stock at a
18   weighted average price of $30.85 per share during fiscal 2007. At March
19   31, 2007, 477,810 shares remain under a 1.0 million share repurchase
20   authorization adopted by our Board of Directors on October 26, 2005.

21   29.    On July 11, 2007, PFF issued a press release entitled "PFF Bancorp, Inc.
22   Announces Credit-Related Charge," in a release which stated in part:

23       PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
24       "Bank"), Glencrest Investment Advisors, and Diversified Builder
25       Services (DBS), announced today that it expects to record a provision for
26       loan and lease losses in the range of $20.0 million to $21.0 million for
27       the quarter ended June 30, 2007. The charge is expected to have a $0.48
28       to $0.51 per diluted share impact on operating results for the quarter.

The provision is primarily a result of credit weaknesses we are experiencing in the residential construction and land segment of our loan portfolio, as we continue to observe slow levels of sales and downward pressure on prices on a number of residential construction projects we have financed, particularly in the Central Valley and Coachella Valley regions of California. . . .

We anticipate net charge-offs for the quarter in the range of $7.5 to $8.0 million, attributable principally to three loans aggregating $7.4 million made by DBS to a developer in the Central Valley. Those three loans were secured by second trust deeds on developed residential lots. Following these charge-offs, DBS has two loans outstanding to this developer aggregating $8.3 million, $2.8 million of which is secured by real estate and is classified "special mention" and $5.5 million of which is partially secured by other collateral and is classified "doubtful". This loan is not included in our construction and land loan category. In addition to DBS's extensions of credit to this developer, the Bank has six loans outstanding aggregating $23.4 million to the same developer on three other projects, all of which are located in the Central Valley. All of the Bank's loans to this developer are secured by first trust deeds on residential real estate, and all of the Bank's extensions of credit are classified as either "special mention" or "substandard."

The provision also reflects increases in and downgrades to classified loans, as we employ an aggressive approach to downgrading credits that are experiencing slower than projected sales and/or increases in loan to value ratios arising from declines in residential home and land prices.

30.    Upon this news, PFF's stock price dropped in one day from $25.75 per share to $20.97 per share. However, the stock continued to be artificially inflated as

1   defendants concealed the extent of PFF's problems.  The allowances announced were
2   significant to reported earnings but were a tiny fraction of Loans and Leases
3   Receivable.

4          31.     On July 23, 2007, PFF issued its first quarter fiscal 2008 financial results
5   in a release which stated in part:

6          PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
7          "Bank"), Diversified Builder Services, Inc. ("DBS") and Glencrest
8          Investment Advisors, Inc. ("Glencrest"), today reported net earnings of
9          $1.8 million or $0.08 per diluted share for the quarter ended June 30,
10         2007 compared to $15.4 million or $0.62 per diluted share for the
11         comparable period of 2006. As discussed in our news release on July 11,
12         2007, we recorded a $20.9 million ($0.49 per diluted share) provision for
13         loan and lease losses attributable primarily to the residential construction
14         and land segment of our loan portfolio.

15                              *        *        *

16         Kevin McCarthy, President and CEO commented, "With the
17         openings of our Apple Valley, Palm Desert, Adelanto and Hesperia full
18         service branches, we are solidifying our branch footprint in the Inland
19         Empire and continuing to build on our 'Customers First' brand of
20         service."

21         Non-accrual loans were $21.3 million or 0.46 percent of gross
22         loans and leases at June 30, 2007 compared to $11.4 million or 0.24
23         percent of gross loans and leases at March 31, 2007. During the current
24         quarter, the $8.9 million portion of a $43.0 million construction loan
25         located in Scottsdale, Arizona that was on non-accrual at March 31,
26         2007, was paid off, including all delinquent interest due. At June 30,
27         2007, our $21.3 million of non-accrual loans primarily consisted of two
28         credits to unrelated borrowers; a first trust deed $10.9 million residential

lot development loan in Desert Hot Springs, California and a $5.5 million partially secured commercial line of credit at DBS.

Assets classified special mention and substandard increased $89.9 million and $99.0 million, respectively, between March 31 and June 30, 2007, to $133.7 million and $150.5 million, respectively, net of specific loss allowances of $0 and $3.8 million, respectively, due principally to increases in classified residential construction and land loans. At June 30, 2007, our allowance for loan and lease losses ("ALLL") was $59.6 million or 1.28 percent of gross loans and leases compared to $46.3 million or 0.98 percent of gross loans and leases at March 31, 2007.

McCarthy added, *"We have always employed a very proactive and preemptive approach to asset classification well in advance of the credits progressing to non-accrual status. Our level of non-accrual loans remains at a very manageable level and we believe that our early identification and monitoring of these credits significantly improves our probability of collecting all amounts due."*

\*       \*       \*

During the quarter we issued $30.0 million of floating rate junior subordinated debentures ("Capital Securities") through a newly formed unconsolidated special purpose business trust, PFF Bancorp Capital Trust III ("Trust III"). These Capital Securities mature September 1, 2037 and bear interest at three month LIBOR plus 1.35%. To capitalize Trust III and upstream the proceeds from the issuance of the Capital Securities from Trust III to the Bancorp, the Bancorp issued $31.0 million of floating rate junior subordinated debentures to Trust III with terms identical to those of the Capital Securities. The proceeds from the issuance represent additional resources to the Company, to be used for general corporate purposes.

1          We repurchased 801,375 shares of our common stock at a
2      weighted average price of $29.15 per share during the quarter. At June
3      30, 2007, 676,435 shares remain under a 1.0 million share repurchase
4      authorization adopted by our Board of Directors on May 23, 2007.

5      32.    On August 10, 2007, PFF filed a Form 12b-25, Notification of Late
6  Filing, with the SEC for the first quarter fiscal 2008 Form 10-Q, explaining:

7          The Registrant expects to report reduced operating results for the
8      three months ended June 30, 2007 compared to the comparable period of
9      2006.   The decrease in operating results primarily reflects a $20.9
10     million provision for loan and lease losses for the three months ended
11     June 30, 2007 compared to a $500,000 provision for loan and lease
12     losses for the comparable period of 2006.   As discussed in the
13     Registrant's news releases dated July 11, 2007 and July 23, 2007, the
14     provision is primarily a result of credit weaknesses the Registrant is
15     experiencing in the residential construction and land segment of its loan
16     portfolio, as the Registrant continues to observe slow levels of sales and
17     downward pressure on prices on a number of residential construction
18     projects the Registrant has financed, particularly in the Central Valley
19     and Coachella Valley regions of California.  For additional information,
20     see the Registrant's Current Reports on Form 8-K, filed with the
21     Securities and Exchange Commission on July 13, 2007 and July 24,
22     2007.

23     33.    On August 13, 2007, PFF issued a press release entitled "PFF Bancorp
24  Concludes Credit Review and Provides First Quarter 2008 Earnings Update," in a
25  release which stated in part:

26         PFF Bancorp, Inc., the holding company for PFF Bank & Trust,
27     Diversified Builder Services, Inc. and Glencrest Investment Advisors,
28     Inc. today reported that it has concluded the internal review referenced in

- 16 -

its Notice of Late Filing of Form 10-Q filed with the Securities and Exchange Commission on August 10, 2007. The review resulted in a $900,000 increase to the provision for loan and lease losses for the quarter ended June 30, 2007, bringing the provision for the quarter to $21.8 million compared to the $20.9 million previously disclosed in our earnings release dated July 23, 2007. As a result of this additional provision; our allowance for loan and lease losses will increase to $60.5 million at June 30, 2007, compared to the $59.6 million previously disclosed. We will also be placing a number of loans that were less than 90 days past due at June 30, 2007 on non-accrual status as of that date resulting in an approximately $1.3 million reduction to previously reported interest income for the quarter ended June 30, 2007. All of the additional loans that were placed on non-accrual status had been identified as criticized or classified assets prior to June 30, 2007 and were considered in the evaluation of our allowance for loan and lease losses at June 30, 2007. As a result of the above adjustments, our Form 10-Q for the quarter ended June 30, 2007, will reflect diluted earnings per share of $0.02 compared to the $0.08 previously disclosed in our July 23, 2007 earnings release.

We expect to file our Form 10-Q on August 14, 2007 and will also file a Form 8-K/A amending our Form 8-K dated July 24, 2007, containing our earnings release dated July 23, 2007, to reflect the changes noted above.

34.    Due to the August 10 and August 13, 2007 announcements, PFF's stock dropped more than $2.70 per share from August 10 to August 15, 2007.

35.    On October 22, 2007, PFF issued its second quarter fiscal 2008 financial results in a release which stated in part:

1   PFF Bancorp, Inc., the holding company for PFF Bank & Trust (the
2   "Bank"), Diversified Builder Services, Inc. ("DBS") and Glencrest
3   Investment Advisors, Inc. ("Glencrest"), today reported a net loss of $7.5
4   million or $0.33 per diluted share for the quarter ended September 30,
5   2007 compared to net income of $14.0 million or $0.56 per diluted share
6   for the comparable period of 2006.

7       Our net loss for the current quarter was due to a $34.0 million
8   provision for loan and lease losses recorded during the current quarter.
9   This provision resulted in a $33.9 million increase in our allowance for
10  loan and lease losses ("ALLL") which now stands at $94.4 million or
11  2.29 percent of net loans and leases. The significant provision reflects
12  increases in criticized and classified loans caused by downward pricing
13  pressure and slowing sales rates for both new and existing residential
14  real estate.

15      The disbursed balance of assets classified special mention and
16  substandard increased $142.6 million and $75.7 million, respectively,
17  between June 30 and September 30, 2007, to $188.6 million and $278.3
18  million, respectively, net of specific loss allowances of $7.4 million at
19  June 30, 2007 and $37.6 million at September 30, 2007, respectively,
20  due principally to increases in classified residential construction and land
21  loans. The composition of our criticized and classified assets and non-
22  accrual loans at September 30, 2007 is provided under the Selected
23  Ratios and Other Data section of this release.

24      Non-accrual loans increased $126.5 million during the quarter to
25  $227.7 million or 5.52 percent of net loans and leases at September 30,
26  2007 compared to $101.2 million or 2.45 percent of net loans and leases
27  at June 30, 2007. Included in non-accrual loans at September 30, 2007
28  are $81.6 million in loans that are current or less than ninety days past

due, but are exhibiting weaknesses in the underlying collateral or borrower strength. Non-accrual construction loans increased $79.4 million during the quarter. The $79.4 million is comprised entirely of sixteen first trust deed loans to eight borrowers with the largest loan balance being $34.0 million. A $38.1 million increase in non-accrual single family loans was attributable to eighty-five first trust deed non-owner occupied loans aggregating $36.3 million to a common borrower. This borrower also has commercial loans of $8.3 million secured by leases and other real estate collateral and $3.7 million in commercial and real estate loans with the Bank, all of which have been placed on non-accrual during the quarter ended September 30, 2007. $9.8 million of the $34.0 million provision for loan and lease losses during the quarter was attributable to this relationship. Our next largest concentration of single family non-owner-occupied loans to one borrower is comprised of 29 loans aggregating $15.6 million. We have one other single family loan borrower relationship in excess of $10.0 million and two in excess of $5.0 million. These loans are performing and paying as agreed.

Kevin McCarthy, President and CEO commented: "While the housing market in our region is continuing to undergo a significant correction, *we remain confident in the underlying economic strength of the Inland Empire to provide the engine that will allow our community banking franchise to continue to prosper*."

The balance of construction, commercial business, commercial real estate and consumer loans (the "Four-Cs") remained essentially unchanged on a sequential quarter basis. At September 30, 2007, the Four-Cs totaled $2.52 billion or 63 percent of loans and leases receivable, net, compared to $2.42 billion or 59 percent of loans and leases receivable, net, one year ago. Reflecting the slowdown in

1  residential construction lending, Four-Cs originations were $265.3
2  million or 79 percent of total originations for the current quarter
3  compared to $612.8 million or 86 percent of total originations for the
4  comparable quarter of 2006 and $394.2 million or 86 percent of total
5  originations for the quarter ended June 30, 2007. At September 30, 2007,
6  DBS had outstanding loans receivable, net of $94.7 million compared to
7  $118.4 million at March 31, 2007.
8                         *       *       *
9      We repurchased 810,600 shares of our common stock at a
10 weighted average price of $16.97 per share during the quarter bringing
11 fiscal year-to-date repurchases to 1,611,975 shares at a weighted average
12 price of $23.03 per share. At September 30, 2007, 865,835 shares remain
13 under a 1.0 million share repurchase authorization adopted by our Board
14 of Directors on July 25, 2007. While there are presently no restrictions
15 on our ability to repurchase shares of our stock, given the uncertainty
16 associated with the current credit conditions, our desire to preserve both
17 capital and liquidity and ensure the sustainability of our cash dividend
18 program, we have temporarily suspended our repurchase program. At
19 September 30, 2007, the Bank's core, Tier 1 risk-based and total risk-
20 based ratios of 8.72%, 9.96% and 11.18% remain well above the 5.00%,
21 6.00% and 10.00% levels required to be considered "Well Capitalized"
22 under Federal regulations.
23      During the quarter ended September 30, 2007, we renegotiated the
24 terms of our $75.0 million line of credit with a commercial bank and at
25 September 30, 2007, we are in compliance with all covenants thereunder.
26 36.    On this news, PFF's stock dropped from $13.94 per share on October 22,
27 2007 to $10.56 per share on October 24, 2007, a two-day decline of 25% on volume
28 of 5.1 million shares on October 23, 2007, 10 times the average three-month volume.

1  However, the stock price continued to be artificially inflated. Had PFF recorded loan

2  loss allowances commensurate with the problems in its portfolio, its loss would have

3  been much larger, and the stock drop greater.

4       37.    On January 15, 2008, PFF announced preliminary results for its third

5  quarter fiscal 2008 in a release which stated in part:

6        PFF Bancorp, Inc. announced today that it expects to record a

7        consolidated provision for loan and lease losses for the quarter ended

8        December 31, 2007 comparable to the provision recorded for the quarter

9        ended September 30, 2007, primarily reflecting continued weakness in

10      the Company's residential construction and land loan portfolio. The

11      Company expects net charge-offs for the quarter of approximately $55

12      million resulting in a December 31, 2007 period-end balance of non-

13      accrual loans comparable to the level at September 30, 2007.

14       38.    This news caused the Company's stock to drop to $8.15 per share.

15       39.    On January 29, 2008, PFF issued a press release entitled "PFF Bancorp

16  Reports Third Quarter Results and Suspends Quarterly Dividend," which stated in

17  part:

18      PFF Bancorp, Inc. (the "Company"), the holding company for PFF Bank

19      & Trust (the "Bank"), Diversified Builder Services, Inc. ("DBS") and

20      Glencrest Investment Advisors, Inc. ("Glencrest"), today reported a net

21      loss of $14.7 million, or $0.65 per diluted share, for the quarter ended

22      December 31, 2007 compared to net earnings of $13.6 million, or $0.55

23      per diluted share, for the comparable period of 2006.

24         During our fiscal third quarter we recorded a $35.0 million

25      provision for loan and lease losses attributable principally to the

26      residential construction and land segments of our portfolio. DBS loans

27      accounted for $5.0 million of the $35.0 million consolidated provision.

28      Approximately $20.0 million of the provision recorded during the third

- 21 -

1    quarter was attributable to the initial identification of problem credits as

2    criticized or classified and the remainder of the provision was

3    attributable to changes in the valuation allowances assigned to

4    previously criticized or classified assets. Consistent with the previous

5    two quarters, the significant provision for loan and lease losses reflects

6    continued downward pressure on valuations of residential real estate.

7    During the third quarter, based on the impact of current market

8    conditions and collateral values, $56.6 million of loans and leases were

9    charged-off. The $56.6 million of charge-offs during the third quarter

10    included $30.0 million of specific valuation allowances established in

11    previous quarters. The composition of the charge-offs during the third

12    quarter was as follows: (i) first trust deeds secured by residential

13    construction and land of $40.9 million; (ii) one-to-four family residential

14    properties of $3.3 million; (iii) commercial business loans of $11.8

15    million; and (iv) consumer loans of $575,000. The one-to-four family

16    residential and commercial business loan charge-offs were attributable

17    principally to the single borrower relationship described in our

18    September 30, 2007 Form 10-Q and were substantially provided for

19    during the previous quarter. At December 31, 2007, our allowance for

20    loan and lease losses ("ALLL") was $72.8 million or 1.81 percent of net

21    loans and leases.

22        During the third quarter, we also recorded a $2.5 million provision

23    for estimated losses assigned to our total exposure to undrawn letters of

24    credit which was comprised of 41 letters of credit aggregating $24.1

25    million at December 31, 2007. This allowance is included in accrued

26    expenses and other liabilities and the provision was recorded in other

27    general and administrative expense.

28

1    The disbursed balance of assets classified special mention,
2    substandard and doubtful increased $127.6 million, $126.6 million and
3    $14.4 million, respectively, between September 30 and December 31,
4    2007, to $305.4 million, $404.9 million and $14.4 million, respectively,
5    net of specific loss allowances of $37.6 million at September 30, 2007
6    and $975,000 at December 31, 2007. These increases were principally
7    due to increases in classified residential construction and land loans. The
8    composition of our criticized and classified assets and non-accrual loans
9    at December 31, 2007 is provided under the Selected Ratios and Other
10   Data section of this release.

11   Non-accrual loans were $235.2 million, or 5.84 percent of net
12   loans and leases at December 31, 2007. The balance of non-accrual loans
13   were reduced by the charge-off of specific reserves during the third
14   quarter. Net of specific valuation allowances of $975,000 and $37.6
15   million at December 31 and September 30, 2007, respectively, non-
16   accrual loans were $234.2 million or 5.81 percent of net loans and leases
17   at December 31, 2007, compared to $190.1 million or 4.61 percent of net
18   loans and leases at September 30, 2007.

19                              *        *        *

20   Kevin McCarthy, the Company's President and CEO commented:
21   *"We are focusing significant resources on remedying the non-accrual*
22   *loan problem we face through restructuring and renegotiating loan*
23   *terms in order to maximize recovery of our investment during these*
24   *challenging times. We remain confident in the underlying economic*
25   *strength of the Inland Empire to provide the economic engine that will*
26   *reinvigorate the real estate market and restore our community banking*
27   *franchise to profitability."*

28

Total loans and leases receivable, net, decreased $70.2 million in the quarter ended December 31, 2007 from the quarter ended September 30, 2007. The balance of construction, commercial business, commercial real estate and consumer loans (the "Four-Cs") decreased $102.4 million in the quarter ended December 31, 2007 from the quarter ended September 30, 2007, which reflects the slowdown in residential construction lending. At December 31, 2007, the Four-Cs totaled $2.42 billion, or 61 percent of loans and leases receivable, net, compared to $2.46 billion, or 60 percent of loans and leases receivable, net, at December 31, 2006. Four-Cs originations were $203.7 million, or 72 percent of total originations, for the third quarter compared to $419.9 million, or 85 percent of total originations, for the comparable quarter of 2006 and $259.9 million, or 79 percent of total originations, for the quarter ended September 30, 2007. At December 31, 2007, DBS had outstanding loans receivable, net of $82.7 million compared to $118.4 million and $94.7 million at March 31 and September 30, 2007, respectively.

*   *   *

During the quarter ended December 31, 2007, our $75.0 million line of credit with a commercial bank matured. We renegotiated a new line of credit of $60.0 million to mature on August 31, 2008. The financial covenants in the new line of credit include the following: (i) the Bank and the Company must show a net profit on a rolling four-quarter basis, (ii) the Bank and the Company must maintain at all times a ratio of non-performing loans (as defined) to total loans which is equal to or less than 6.00%, tested quarterly. (iii) the Bank and the Company must maintain well capitalized regulatory capital ratios, as required by federal regulators, (iv) the Company must maintain a consolidated tangible net

worth of not less than $320.0 million, tested quarterly, (v) the Company shall not merge into or consolidate with any other business enterprises, or another business enterprise shall not merge into the Company, without prior written consent of the lender and (vi) an event of default shall occur if the Company and/or Bank become subject to a "Memorandum of Understanding" a "Cease and Desist Order" or other regulatory action that reflects any material adverse change in the safety and soundness of the Company and/or Bank. Additionally, this line of credit is secured by a pledge of the stock of the Bank. The debt relating to the Company's credit facility is classified as a component of "FHLB advances and other borrowings" in our Consolidated Balance Sheets. As of December 31, 2007, the Company is in violation of the rolling four quarter net profit and non-performing loan covenants under this line of credit. The Company is in the process of seeking a waiver of these two covenants as of December 31, 2007.

*Due to the uncertainty surrounding the timing of the recovery in residential real estate and the impact of credit on our operating results, the Company's Board of Directors has suspended the quarterly cash dividend effective immediately. Mr. McCarthy added: "We will continue to review our dividend policy each quarter and expect to resume dividend payments when our operating results return to a level of sustained profitability."*

40.    Notwithstanding the loss and suspension of the dividend, PFF's stock price reacted somewhat positively to this release due to defendants' statements of confidence in the Company's underlying business.

41.    On April 1, 2008, PFF issued a press release entitled "PFF Bancorp, Inc. Announces Sale of DBS Loans and Preliminary Credit-Related Information for the Fourth Fiscal Quarter," in a release which stated in part:

1    PFF Bancorp, Inc. announced today that its subsidiary, Diversified

2    Builder Services, Inc. ("DBS") has completed the sale of substantially all

3    of its loan portfolio. The risk profile of this portfolio was significantly

4    greater than that of the Bank's loan portfolio, with second trust deeds

5    and unsecured loans comprising a significant portion of the portfolio. As

6    part of its overall risk reduction strategy, the Company undertook an

7    accelerated disposition program that included negotiated payoffs and

8    principal reductions, culminating in the sale of substantially all

9    remaining loans in a single transaction on March 31, 2008. DBS

10   recorded a provision for loan losses of approximately $48 million in the

11   March quarter, reflecting the write-downs associated with the expedited

12   disposition of the portfolio. The proceeds from the payoffs, principal

13   reductions and sale of the portfolio, together with refunds of prior year

14   income taxes arising from the carryback of net operating losses, will be

15   utilized by the Company principally to retire short-term debt.

16   Kevin McCarthy, PFF Bancorp President and CEO commented:

17   ***"This transaction marks a significant milestone in our proactive efforts***

18   ***to reduce the risk profile of the Bancorp and all but eliminates the***

19   ***uncertainty that was surrounding the DBS portfolio."***

20                         *        *        *

21   The Company's bank subsidiary, PFF Bank & Trust (the "Bank"),

22   is continuing its process of completing a comprehensive quarterly review

23   of its loan portfolio, including the updating of appraisals on properties

24   securing loans that have been previously identified as classified or

25   criticized. This review will not be completed for several more weeks.

26   However, based upon preliminary results of this review, the Company

27   believes that the Bank's provision for loan and lease losses for the

28   quarter ended March 31, 2008, may exceed ***$120 million***. The provision

- 26 -

1  is attributable principally to the residential construction and land
2  segments of the Bank's portfolio, and reflects changes in the valuation
3  allowances assigned to previously criticized or classified assets as a
4  result of reductions in collateral values based upon updated appraisals,
5  and to a lesser extent, the identification of additional problem credits and
6  the migration of previously identified criticized or classified assets
7  within classification categories.

8      The Company currently expects to complete its review of the
9  Bank's loan portfolio and issue a press release announcing its results of
10  operations for the quarter and year ended March 31, 2008 in early May
11  2008.

12  42.   After this disclosure, PFF's stock fell to $6.86 per share on April 2, 2008,
13  from $8.48 per share on April 1, 2008, a decline of 20%.

14  43.   On April 30, 2008, PFF issued a press release entitled "PFF Bancorp, Inc.
15  Provides Preliminary Financial Information for Quarter Ended March 31, 2008,"
16  which stated in part:

17  PFF Bancorp, Inc. (the "Holding Company"), the holding company for
18  PFF Bank & Trust (the "Bank"), Diversified Builder Services, Inc. and
19  Glencrest Investment Advisors, Inc., today announced that it expects to
20  report a consolidated net loss of approximately $159 million for the
21  quarter ended March 31, 2008. The operating results for the quarter
22  include an estimated *$196 million* consolidated provision for loan and
23  lease losses and an estimated $44 million valuation allowance
24  established against the Holding Company's consolidated deferred tax
25  asset.

26      The Holding Company has a secured term loan agreement with a
27  commercial bank, with a current outstanding balance of $44.0 million.
28  Upon the filing of its quarterly Thrift Financial Report on April 30, 2008,

- 27 -

1   the Bank is classified as "adequately capitalized" for regulatory
2   purposes. This classification would have resulted in an event of default
3   under a covenant of the loan agreement as of April 30, 2008. On April
4   30, 2008, the lender granted the Holding Company a waiver of all events
5   of default as of April 30, 2008, including the requirement to make
6   prepayments on the loan upon receipt of any excess cash flow. The
7   Holding Company is working with the lender to further restructure the
8   loan agreement.

9       44.   On this news, PFF's stock dropped to $2.48 per share on May 1, 2008, a
10  decline from $3.78 per share on April 30, 2008, and a decline of 85% from $18.50 per
11  share on August 9, 2007. The stock subsequently continued to decline as the extent of
12  the Company's problems was absorbed by the market.

13      45.   On July 15, 2008, PFF announced it would move its shares from trading
14  on the New York Stock Exchange to the OTC Bulletin Board.

15      46.   On August 11, 2008, PFF filed its Form 10-Q for the quarter ended June
16  30, 2008, which included a net loss of $18 million, due in part to a provision for loan
17  losses of $10.9 million.

18      47.   On November 10, 2008, PFF filed its Form 10-Q for the quarter ended
19  September 30, 2008 reporting a loss of $68 million, including a provision for loan
20  losses of $62 million.

21      48.   Within a week of this filing, PFF's stock would drop to below $1 per
22  share.

23      49.   Finally, the debacle was complete when, on November 21, 2008, after the
24  market closed, the Bank was closed by regulators and taken over by U.S. Bancorp.
25  Following this announcement, PFF's stock declined to $0.01 per share – a total loss
26  for investors.

27      50.   The true facts, which were known by the defendants but concealed from
28  the investing public during the Class Period, were as follows:

1         (a)    Defendants' assets contained hundreds of millions of dollars worth

2 of impaired and risky securities, many of which were backed by real estate that was

3 rapidly dropping in value;

4         (b)    Prior to and during the Class Period, PFF had been extremely

5 aggressive in generating loans, including being heavily involved in offering HELOCs,

6 which would be enormously problematic if the value of residential real estate did not

7 continue to increase;

8         (c)    Defendants failed to properly account for PFF's real estate loans,

9 failing to reflect impairment in the loans;

10         (d)    PFF's business prospects were much worse than represented due to

11 problems in the Inland Empire market, which was a key focus of PFF's business; and

12         (e)    PFF had not adequately reserved for loan losses on HELOCs and

13 on other real estate-related assets.

14     51.    In fact, by late 2005, it was evident to industry insiders that residential

15 real estate in the Inland Empire had peaked. This directly impacted the valuation of

16 many of PFF's assets. By late 2006, this was even more apparent to insiders, yet

17 defendants failed to adequately increase allowances for loan losses, causing the

18 Company's financial statements to be misstated.

19                 **LOSS CAUSATION/ECONOMIC LOSS**

20     52.    By misrepresenting PFF's financial position, the defendants presented a

21 misleading picture of the Company's business and prospects. Thus, instead of

22 truthfully disclosing during the Class Period that PFF's business was not as healthy as

23 represented, PFF falsely concealed the extent of its exposure to declining asset values

24 related to its largest asset – Loans and Leases Receivable – and the threat to its entire

25 business from real estate values dropping in the Inland Empire.

26     53.    Defendants' claims of profitability and confidence in the market caused

27 and maintained the artificial inflation in PFF's stock price throughout the Class Period

28

1  and until the truth about its past and future earnings was gradually revealed to the
2  market.

3  54. Defendants' false and misleading statements had the intended effect and
4  caused PFF's stock to trade at artificially inflated levels throughout the Class Period,
5  reaching as high as $35.45 per share in December 2006.

6  55. As a result of defendants' false statements, PFF's stock traded at inflated
7  levels during the Class Period. However, after the above revelations seeped into the
8  market, the Company's shares were hammered by massive sales, sending them down
9  more than 100% from their price before these disclosures.

10  **COUNT I**

11  **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
   **Against All Defendants**

12  56. Plaintiff incorporates ¶¶1-55 by reference.

13  57. During the Class Period, defendants disseminated or approved the false
14  statements specified above, which they knew or deliberately disregarded were
15  misleading in that they contained misrepresentations and failed to disclose material
16  facts necessary in order to make the statements made, in light of the circumstances
17  under which they were made, not misleading.

18  58. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:
19      (a) employed devices, schemes and artifices to defraud;
20      (b) made untrue statements of material facts or omitted to state
21  material facts necessary in order to make the statements made, in light of the
22  circumstances under which they were made, not misleading; or
23      (c) engaged in acts, practices and a course of business that operated as
24  a fraud or deceit upon plaintiff and others similarly situated in connection with their
25  purchases of PFF common stock during the Class Period.
26  59. Plaintiff and the Class have suffered damages in that, in reliance on the
27  integrity of the market, they paid artificially inflated prices for PFF common stock.
28

1  Plaintiff and the Class would not have purchased PFF common stock at the prices they

2  paid, or at all, if they had been aware that the market prices had been artificially and

3  falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

60.    Plaintiff incorporates ¶¶1-59 by reference.

61.    The defendants acted as controlling persons of PFF within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of PFF stock, the defendants had the power and authority to cause PFF to engage in the wrongful conduct complained of herein.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

**CLASS ACTION ALLEGATIONS**

62.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired PFF common stock during the Class Period (the "Class").  Excluded from the Class are defendants.

63.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  PFF has over 22 million shares of common stock outstanding, owned by hundreds if not thousands of persons.

64.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

- 31 -

1
        (c)    whether defendants' statements omitted material facts necessary to

2
make the statements made, in light of the circumstances under which they were made,

3
not misleading;

4
        (d)    whether defendants knew or deliberately disregarded that their

5
statements were false and misleading;

6
        (e)    whether the price of PFF common stock was artificially inflated;

7
and

8
        (f)    the extent of damage sustained by Class members and the

9
appropriate measure of damages.

10
    65.    Plaintiff's claims are typical of those of the Class because plaintiff and

11
the Class sustained damages from defendants' wrongful conduct.

12
    66.    Plaintiff will adequately protect the interests of the Class and has retained

13
counsel who are experienced in class action securities litigation. Plaintiff has no

14
interests which conflict with those of the Class.

15
    67.    A class action is superior to other available methods for the fair and

16
efficient adjudication of this controversy.

17
**PRAYER FOR RELIEF**

18
WHEREFORE, plaintiff prays for judgment as follows:

19
    A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ.

20
P. 23;

21
    B.    Awarding plaintiff and the members of the Class damages, including

22
interest;

23
    C.    Awarding plaintiff's reasonable costs and attorneys' fees; and

24
    D.    Awarding such equitable/injunctive or other relief as the Court may deem

25
just and proper.

26

27

28

1

## JURY DEMAND

2          Plaintiff demands a trial by jury.

3    DATED:  January __, 2009          COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
4                                      DARREN J. ROBBINS
                                       DAVID C. WALTON
5

6                                      _____
                                              DAVID C. WALTON
7

8                                      655 West Broadway, Suite 1900
                                       San Diego, CA  92101-3301
9                                      Telephone:  619/231-1058
                                       619/231-7423 (fax)
10
                                       ABRAHAM FRUCHTER & TWERSKY LLP
11                                     JACK G. FRUCHTER
                                       One Pennsylvania Plaza, Suite 2805
12                                     New York, NY  10119
                                       Telephone:  212/279-5050
13                                     212/279-3655 (fax)

14                                     Attorneys for Plaintiff

15   S:\CptDraft\Securities\Cpt PFF Bancorp.doc

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATION OF MENACHEM MAIMAN
IN SUPPORT OF CLASS ACTION COMPLAINT

Menachem Maiman (Aplaintiff@) declares, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the complaint prepared by counsel in the above-captioned case and has authorized its filing.

2.   Plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff=s counsel or in order to participate in any private action arising under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   During the proposed Class Period, plaintiff executed the following transactions in the stock of PFF Bancorp Inc.: See Attachment A

5.   In the past three years, plaintiff has not served, nor sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws.

6.   Plaintiff will not accept payment for serving as a representative party on behalf of a class beyond plaintiff=s pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this day

of December, 2008.

Menachem Maiman

ATTACHMENT A

| Date | Action | Amount | Price |
|------|--------|--------|-------|
| May 2, 2008 | Buy | 1,540 shares | $1.58 |
| September 18, 2008 | Sell | 1,000 shares | $1.32 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| MENACHEM MAIMAN, Individually and On Behalf of All Others Similarly Situated | GREGORY C. TALBOTT and KEVIN MCCARTHY |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| David C. Walton, Coughlin Stoia Geller Rudman & Robbins LLP 655 West Broadway, Suite 1900, San Diego, CA 92101 619/231-1058 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No      ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Complaint for Violation of the Federal Securities Laws 15 U.S.C. §§78j(b) 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 444 Welfare | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:  Case Number: **SACV09-00012 AG (ANx)**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):**    Date January 5, 2009

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

CV-71 (05/08)                              CIVIL COVER SHEET                              Page 2 of 2

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Andrew Guilford and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV09- 12 AG (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

---

CV-18 (03/06)          NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

MENACHEM MAIMAN, Individually and On
Behalf of All Others Similarly Situated,

PLAINTIFF(S)

v.

GREGORY C. TALBOTT and KEVIN
MCCARTHY,

DEFENDANT(S).

CASE NUMBER

SACV09-00012 AG (ANx)

SUMMONS

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within ___20___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _David C. Walton_____, whose address is _Coughlin Stoia, et al., 655 West Broadway, Suite 1900, San Diego, CA  92101_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   JAN - 5 2009

By: _____

**ROLLS ROYCE PASCHAL**

Deputy Clerk

*(Seal of the Court)*

1144

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                                          SUMMONS